Good morning. Derek Newman for Honor Society. The first point that I would like to discuss is that the Mississippi Supreme Court in Parr Industries and Scruggs is clear that a plaintiff in a tortious interference with contract case must present evidence that the defendant caused a third party to breach a contract with the plaintiff. But the judge below did not require any evidence of any contract that a third party breached. And on causation, the only evidence that the court considered was correlation in time between Honor Society's speech and PTK's alleged injuries. Do you seek us to vacate this injunction just purely on the failure to establish causation, separate and apart from all these different Mississippi tortious theories? Well, there's two bases on the underlying claim, that there was no third party that breached a contract with PTK and that there was no evidence of causation because it's well settled that court. That's what I'm asking. Are you saying they didn't establish causation so therefore we should vacate the injunction? Yes, Your Honor. Let me ask you this, what if we read this order as the judge issued the injunction here because they violated the tort of interference with business relations or business contracts? I mean, isn't that what the judge issued the injunction on? No, Your Honor. There were two torts alleged in the complaint. The court only analyzed one, tortious interference with contract. Contract relations is what he said, though. Tortious interference with contract, which requires that a third party breach a contract. There is a second tort. The court didn't analyze that. And that's tortious interference with prospective economic relations. And there, the court would have to find that PTK was reasonably certain that it was going to enter a contract and that the defendant wrongfully interfered with the contract that hadn't yet been entered into but was going to. The court didn't analyze that tort and made no factual findings in connection with it. As I read the opinion, correct me if you disagree with me, that the judge was dealing with tortious interference with business relations. And most of these misrepresentations talk about both torts. And so there are three elements of that tort. But the element of requiring that there's an enforceable contract that has been breached and would have been performed but for the interference is not one of the elements he discussed there. So he discusses those elements and the actual damages. And then this is the conclusion just before he signed off on the order. PTK is substantially likely to prevail on the first three elements of a tortious interference with contractual relations claim. This court also finds that it is substantially likely to prove actual loss and damage resulting from society's actions. So why doesn't that mean that that's the tort that he issued the injunction in? The court missed the threshold element. Namely, that on one tort, a third party contract must have been breached. And on the other tort, that the court did not analyze that PTK was on the verge of entering into a contract. That's the threshold element and I'll cite those two cases again for the court so that you can review them. Parr Industries is one. Scruggs is another. Clear that there's a threshold element before the court ever gets to the one, two, and three that Judge Davis just read to us. Well, the plaintiff sued on both torts. But in deciding the case, the judge did just what I said. He analyzed the issues under the elements for tortious interference with business relations. And then his conclusion made it very clear that that's the tort that he was issuing the injunction on. Why is that not just what it says? Your Honor, that's not the way I read the order. But to the extent that Your Honor reads the order that way, the court missed the threshold element, which is that PTK was reasonably certain to enter into a contract and was unable to enter into that contract. But neither tort has a contract-related element. Is that correct? Yes, Your Honor. And so regardless of which tort, one has an actual contract and one has to be entering into a contract. And neither of those things are established on this record. Is that your position? Yes, Your Honor. Okay. Just making sure we have your argument. Thank you. And the second point that I would like to address, in addition to that first, which I think the court should reverse on a de novo basis because the law was improperly applied, the second point I would like to address is that the court enjoined Honor Society's speech based upon a finding that all of it, collectively, without analyzing any particular part of it, was commercial and that some of it was false and misleading. But if the court had properly applied the law, it would have found that none of Honor Society's speech was commercial and the statements enjoined were truthful and not misleading. What if we disagreed with you and thought that there might be some that was commercial? Would we still strike down this injunction because it's overbroad, because it applies to non-commercial speech like Wikipedia, etc.? Yes, Your Honor. To the extent that the court finds that it was commercial speech, and I think it would be an error to do so, but to the extent the court finds that, it would apply to Central Hudson. And the first question is whether there's false or misleading speech. And Wikipedia, for example, was truthful posts on a public forum that no findings of falsity were even found and couldn't be found. And what is commercial speech? Commercial speech is speech that does nothing more than propose a commercial transaction. And when this court and the Supreme Court review for whether there is commercial speech, and also when reviewing to see whether any statement was false or misleading, the courts look at each category of speech in context and not all speech that was published at any time. So, for example, in Bulger, the Supreme Court reviewed a campaign by a manufacturer of contraceptives. There were three ads at issue, one for contraceptives, another for contraceptives and other products, another that was an informational pamphlet about family planning that also mentioned the purchase of contraceptives. You mentioned Bulger. The test I get out of that for commercial speech is a three-pronged test. Number one, is it an advertisement? Does it mention a product or service? Is there an economic motivation for the speech? I mean, you know, these are two companies fighting for—they're in competition from the same customers. And so, why wasn't the speech really just a negative ad trying to get business away from PTK? So first, Your Honor, the question is, is commercial speech, is speech that does nothing more than propose a commercial transaction? If there's a question as to whether it's speech that does nothing more than proposes a commercial transaction, the court looks to the Bulger three-part test. And here, when looking at each category of speech, we don't need to apply Bulger, but we can. So let's start with the Wikipedia edits. Nobody would seriously suggest that truthful edits on the public forum that is Wikipedia propose a commercial transaction. And because of that, you need not apply the additional elements of Bulger. And to the extent that you found that that was commercial speech, because it was truthful, the court cannot enjoin it. Look at the cartoon image. There was no transaction proposed in connection with the cartoon image. And it's not even capable of being proven true or false. It's subject to interpretation. And the judge's interpretation was surprising. The article about PTK's 30-year executive directory, Rod Risley, and the sexual harassment allegations against him, there was no commercial transaction proposed. And the court didn't even find anything about it false or misleading. Well, you're trying to put your competition in a bad light because you're ruining their business. Your Honor, it's free speech to articulate truthful points about your competition. That's fair competition. And in this case, PTK made statements about Honor Society. Honor Society made statements about PTK. And it's only actionable if it is false or misleading. Or in certain circumstances, if it is commercial, there might be a lower standard applied. But here, there isn't evidence of false or misleading speech that was actually enjoined. The article about the PTK advisor who was arrested for embezzlement, there was no finding that a commercial transaction was proposed. And there was nothing in the article proposing a commercial transaction. And so, because the court lumped all of Honor Society's speech together and didn't analyze any individually, it didn't properly apply the law. I could review other cases, such as Zotterer. There, there was widespread advertising by an attorney. Two advertisements were at issue. Four statements were at issue. The Supreme Court reviewed each of the two advertisements separately, each of the four statements separately. And this court, in Proctor and Gamble v. Amway, reviewed two advertisements. One was a flyer. One was a widespread voice memo. And the court reviewed each to determine whether they were false or misleading. So the guidance that this court and the Supreme Court have given the district courts is when analyzing for commercial speech, and when analyzing to determine whether a statement is false or misleading, the court must review each category of speech separately and may only enjoin that which is false and misleading. But here, the court enjoins speech that is not false, in fact it is truthful, and not misleading, none of which proposed a commercial transaction. And so this court should reverse on the basis that the court misapplied the law, this wasn't commercial speech, and truthful and not misleading statements are enjoined. Okay. So the first one is that it didn't have a contractual requirement. It didn't have a contract. So it couldn't have, you can't do an injunction without a contract. Is that that, which we talked about. There's also that, you mentioned causation earlier. That's another ground. And then the other, next ground is it's not, it's either none of it's commercial speech or not all of it is commercial speech. And it should have been parsed. Is that the next one? I'm trying to make sure I have all of your grounds for possible relief. Can you help me? Just maybe you could do this instead of me, since it's your case. Thank you Judge Elrod. I would be pleased to. So first, the court did not find that a contract with a third party in PTK was breached. Second, the court had no evidence that Honor Society caused any breach of a contract, but rather relied solely on correlation, which isn't sufficient to show causation. Third, none of the speech was commercial. Fourth, the injunction prohibits truthful and not misleading speech. And then, I've talked about my two major points, namely that tortious interference and the commercial speech and false and misleading. I have a third point I'd like to discuss, which is. Let me just ask you one thing. The judge did find some of the speech was misleading and false, did he not? The court did find some speech was misleading, but there wasn't factual support for most of it. And if the court reads the opinion, I think your honors will find that there's lots of reference to false and misleading without any particular factual findings to support it. And to the extent that the court finds commercial speech that is also false and misleading, there is the possibility that the court can enjoin that speech, which in particular is false or misleading, but this injunction enjoins wholesale swaths of speech. And in fact, I would argue all of Honor Society's speech because of the third point I'm going to argue, which is the disclaimer. The disclaimer is compelled speech that the court impose without reviewing the Zoterer factors, which govern disclaimers. And had the court reviewed Zoterer, the court would have found that this disclaimer is unconstitutional. It's pretty innocuous though. I mean, all it does is say that the author of the speech is not unbiased. I mean, that's pretty innocuous. I think anybody reading this would figure that out. Your Honor, it's not innocuous for the three reasons under Zoterer. I see that I'm out of time. I'd be happy to complete the answer or I can repeat it on rebuttal. You can finish it, can't you? Sure. Please address Zoterer. Thank you, Your Honor. So the first question is whether the disclaimer is factual and uncontroversial. Here, the disclaimer requires Honor Society to announce that its CEO is a defendant and counterplaintiff when it is neither. So this disclaimer isn't factual and uncontroversial. You've got two parties fighting with each other. Is that really important? Well, it's certainly not factual and it's certainly controversial. The second point is whether the government is achieving a substantial government interest. Here, the court hasn't identified any interest, let alone a substantial government interest. And the interest that appears in the disclaimer is announcing to the public that Honor Society is not an original plaintiff, but a counterplaintiff, even though there's no material distinction. And if there was, the public wouldn't understand that anyways. And then the third factor of Zoterer, which I think might be most important, is does it impose an undue burden on the speaker? And here, Honor Society's primary mode of social media is Twitter, now known as X, which imposes a 280-character limit on posts. But the judge's disclaimer is 611 characters, which means that Honor Society is prohibited from any speech about this case or PTK on its social media of choice. And on the internet, because the court in a contempt order found that Honor Society is not allowed to put a title before the disclaimer, any reader would only see the disclaimer, would never see the content below it, and would have no reason to continue beyond the disclaimer, which means that Honor Society is effectively prohibited from any speech whatsoever about PTK in this case, and that's an undue burden. Thank you. You've saved time for rebuttal. We'll now hear from Mr. Wallace. May it please the court, Mike Wallace for the appellees. I have my co-counsel, Rachel Smoot, with me at council table. The last two times I've come down here, the cases have mooted out of oral argument. We're on the verge of doing it three times in a row. Last night, we got an email from Honor Society saying that today they would take down all of the contested information from the website. I asked counsel about that when we got here this morning. He says, I don't think it moots anything. It would moot the need to look at the 5,000 individual pages that he says Judge Reeves should have done and didn't. So I don't really know what's left. I'm just going to have to address the issues as if they're still alive. I think that would be for the best, Mr. Wallace, because we don't know whether there's any pending settlement or not, and so I'm sure that y'all will advise the court if that's the case. If that's not the case, and then there might be some issues regarding whether any potential settlement does or does not moot the vacature of the injunction issues. So you can advise us later, but let's proceed with these arguments. How is there causation established in this record, Mr. Wallace? The causation is established by the undisputed factual finding that Honor Society will follow intentionally and maliciously intended to harm my client's business. That's what they intended to do. They put this communication up on the Internet, and my client's business was harmed. But that's the point. How do we know that the business was actually harmed other than the fact that there are perhaps fewer users? We don't know during the relevant time period whether there would be fewer members, users, et cetera, for other reasons. Well, we know several things about the injury, and again, you know, we've cited Mississippi cases where correlation is sufficient. Correlation in time has been held sufficient. Can you give us a couple of those cases? Gasparini. Gasparini's Mississippi case. They said something bad. The plaintiffs started losing business, and the court said that's good enough to get to the jury. We clearly have that here. We have lost business. There were, I think, there were 20 members who resigned. We have something called PTK Connect, which is a business arrangement with universities and businesses. Fifteen percent of them failed to renew. That is clearly damage. They don't deny that damage existed. But we don't know why they failed to renew. Again, there is correlation, and at the preliminary injunction stage, the question for the district judge is are you substantially likely. You know, if the fire alarm goes off and you see smoke coming out of the room, you're substantially likely to find there's a fire. You may get in there and find it's dry ice, but at the preliminary injunction stage, the way to bet is there's a fire going on. So the fire alarm went off on the Internet. People started running for the exits, and I think it was entirely reasonable of Judge Reeves to find that for these purposes that we were entitled to. And he understood that. He said in his order, you're going to have to flesh out more of the causation and damages when we try this case, but at this point, I think you've proven enough damage. I mean, this is a First Amendment prior restrain of speech. I mean, this is a big deal. So we don't, we can't have loosey-goosey kind of approach. It has to be very tight, as we as a court, if we're doing that sort of thing. Then there are several things I will say about the First Amendment. First of all, the First Amendment argument they made below is that you have to prove actual malice in order to recover on a state court tort. Judge Reeves found at page 11 of his preliminary injunction that there was actual malice. It's his finding. It's not challenged on appeal. He quoted the New York Times standard. They've proven that honor society acted with actual malice, and we really shouldn't get there because these aren't public figures anyway. So the only question, the First Amendment question, and I realize the First Amendment applies to commercial speech, but does so in a very narrow way, and the only question is whether this commercial speech is false or misleading. Well, we have to decide whether or not all of the speech, whether any of the speech is in fact commercial, and then whether all of the speech is in fact commercial. Here we are in the modern age with all this electronic stuff that I don't pretend to understand, but I do understand what's in the record, and we went over it for the better part of two days. They use Twitter and Facebook and e-mails to communicate with each other, and with people, and then they establish a link to their website, and so you can connect directly to their website. The website is where they do their business. Mr. Moradian says this is an electronic organization, and so they bring people to their website, and these articles are all interconnected with each other on the website, and I think if you look at the record, you will see at the top of each page a button that says join now. If there's anything more commercial than join now, I don't know what it is, and so all of this should be considered together. He certainly didn't tell the district court when he was trying the case that the district court should consider each of these thousands of screenshots separately. That's not what he argued for, although it's what he's arguing here. So it's clearly commercial. How is Wikipedia commercial? Well, now you're getting into something I know even less about, Your Honor, and it's a good thing, and before you start making law on Wikipedia, you probably ought to have a record, and they could have put in a record on Wikipedia and said this is how it works, and this is what happened, but they didn't do that until after the preliminary injunction was ordered, but Judge Reeves did at the very least see their motivation for what they were doing on Wikipedia. He said they took down everything that made PTK look good and put up stuff that made PTK look bad, and that's exactly what Judge Davis said, isn't that what you were doing on Wikipedia? Let me ask you this. The first item of the injunction was immediately cease edits to PTK's Wikipedia page and subject itself to discovery. Shouldn't that be immediately cease edits to false and misleading edits? Depends on a couple of things. He said Wikipedia is a public forum. You all know that's a very complicated area of First Amendment law, which he has never alleged or proved. I don't know what Wikipedia is, except you can find it on the Internet. Whatever change he was making, though, what you objected to was false and misleading changes. And remember, and again, I mean, is that right? Yes, we object to false and misleading, but we had a track record here, Judge, and Judge Reeves knew that. He had already issued an original preliminary injunction against false and misleading questions, and as the judge described it, what he did was take the same statements, get rid of the question mark, and put a period, and he came back and sat and said, I followed every word of your injunction, and if it isn't in there, I'm going to go ahead and keep on trying to damage these people. Can you just give me a brief description of the matter that you objected to that you proved was false? There are several things. I mean, stick with Wikipedia for a second. There were, and again, we don't own the Wikipedia page. I don't know who owns it. There were 12 names of our graduates on the Wikipedia page that were helmed out to be outstanding examples of good students and good citizens. He went through and took 12 of them off the list. That's not speech. That's suppression of speech. There's nothing in the First Amendment that says you can go on to something you don't own and put a paintbrush over it, and that's what he did and we objected to it. He only added one thing to Wikipedia. He only added one thing, and that is the fellow that shot President Trump as a PTK member. Judge Reeves didn't even tell him to take that down, and it's true. Judge Reeves didn't tell him to take it down. It's still there. But Judge Reeves, after experience with this gentleman who will obey only the words you write, figured he didn't have much leeway to say, don't edit except for this kind of statement, because he'd be right back for the third preliminary injunction here. What else? Give me a minute. What else was false? Those on Wikipedia... No, no. Let's go down the list. We will go down the list. The chapter advisor at Attawamba Community College, she was arrested. They put that picture on their commercial website and said, PTK advisor arrested for falsehoods. Judge Reeves explained that that has at least one falsehood and an implication. They weren't student funds. This was funds belonging to the college, belonging to the state of Mississippi. If it said college funds, then it would be true? If you said college funds, that would be true, but they said student funds. And then the implication, which Judge Reeves clearly saw, was that this woman, and they've said it in their briefs, PTK should have better supervised this woman. She's not a PTK employee. We don't have any obligation or ability to supervise her. She's appointed by the college, and she was arrested, allegedly, for embezzling college funds. This is an advisor for an organization, right? Yes. Okay. Just like any other social organization, the national people can say this person can't be our advisor. They have some say that we don't want to be associated with this person as our advisor, regardless of whether the college wants them. What they have their name on it, they have a right to say. I don't understand your argument there. I don't believe there's any evidence in the record other than the college appoints the advisors and the college is responsible for them. There is certainly evidence in the record that the national organization has good relations with the college. If we saw a problem, I'm sure we'd tell them. If they saw a problem, they'd fix it, but it's their authority. She was a suitable advisor then? Excuse me? She was a suitable advisor from the perspective? As far as we knew. You know, there are, I think we have over a thousand chapters around the country. It is not a duty that we can assume to examine the details of every advisor and every chapter. The colleges do that. That's how the system is set up. They appoint the advisors and we review them. Let me ask you about the, it says limit the reporting on the sexual harassment allegations against Reesley. As I understand it, they had newspaper articles about it and an affidavit or declaration from at least one woman verifying that. So why is that not, why couldn't they publish that? There are two problems with it, and again this happened about ten years ago. The truthful thing in there was that he was accused of sexual harassment. They go on to say we gave him a $3 million golden parachute from student funds. Once again, a golden parachute implies that you're paying him to go away because you're embarrassed by him. The undisputed record shows this was deferred compensation. We paid him the $3 million we owed him, and we didn't take it out of the pockets of the students and give it to him. It came from all PTK funds. That includes our sponsors, that includes any number of, that includes charitable donations because we're a charitable organization. What about just the report of the sexual harassment? The report of sexual, the fact that the accusation was made is true. The assertion that we paid him $3 million, we didn't owe him to go away and we took it out of our members' pockets is false. And again, in the context of commercial speech, which is what this is, there is great latitude on deciding what is false and misleading. This would not be commercial speech. Because from exactly what your Honor said about the Wikipedia page, he's trying to make us look bad so people won't join our organization, he'll make us join his organization. And he put it on his website that has joined now at the top of the page. I don't see how this can be anything but commercial. Yes, there is some public interest in almost anything you say about anything, but this court in Eastman, following Zauderer, which we've talked about in other cases, have taken the position that if you've got commercial speech, putting some sort of political speech tucked in the middle somewhere does not immunize the commercial speech. So anything about public interest was overwhelmed by the massive commercial nature of the enterprise. He uses the internet to bring people to his website and get their money. Can you help us, Mr. Wallace, please? The district court was very concerned with the parody cartoon, which the district court believed was racist on its face. And the court is, by asking questions about it, the court is not condoning racism, but racism is not unprotected speech. But the court seems to think, from reading this, that it could strike something down or remove the cartoon because it's racist, offensive speech. Is that your understanding of the law, Mr. Wallace? And why was that an appropriate finding and determination as to the parody cartoon, which we are not saying is a good thing. We're just saying it's there in the record. When the courts leave, I will start with my understanding of the cartoon, and then I will get to my understanding of the law. What they say, and this is from their brief. It's in page 31 of their brief in this court, and Judge Reeves quotes it at page 15 of his opinion. They say this metaphor, this cartoon is not just a cartoon. It is a metaphor for concerns over PTK's troubling business practice. Now, that is, if nothing else, an implication of fact. They are saying that people are concerned that PTK has troubling business practices, and the only person who is concerned about that is the people at Honor Society. They drum up a controversy and then say they're entitled to comment on it. So the cartoon does have factual content. The content is there is widespread concern over PTK's troubling business practice. It's false. There aren't any troubling business practice and it's false. There isn't anybody that's concerned but Honor Society. But the court doesn't, I mean, other than the fact that the district court says that she is not East Asian, that it's a parody cartoon. It says this behavior is without right or justifiable cause. Mr. Wallace, as an officer of the court, are people allowed to publish racist cartoons without them being enjoined about people, even if they're unfair and terribly racist and, you know, against societal values? If this cartoon was published only because it was racist, then I suppose you would have a First Amendment right to do so. But the judge pulled this out as an example of the hot, I mean, what he quoted was the Mississippi tort law. Mississippi makes it a tort to attack people's business without right. And he said that's what this cartoon is doing. It is attacking our business without right by indicating that we have troubling practices and people are concerned about them. Well, the top 10% claims, the district court says he can't make a determination on that. So we don't know that that's false. No, we don't know that it's false. That's what we're going to try the lawsuit about. So he doesn't decide that that's false. No. The only thing we can look at is this cartoon and the fact that they have a person who's wearing a crown, that does not make that, how is that an appropriate thing to be enjoined under the law, regardless of whether it's a good thing or not? First of all, they admit what the implication of the cartoon is. You have questionable business practices. If it was only racist, you could publish it. But Judge Reeves put this in the context of all of the other false and misleading statements that we've been through, Judge Reeves pointed out how racist this is. The First Amendment allows you to get rid of false and misleading statements, even if they're racist. And that's what he did. Mr. Wallace, if we were to determine, and I'm not foreshadowing, that the injunction might be proper as to some things, but not as to other things, would that mean that we would need to strike it down as overbroad? I've thought about that, and I think, you know, this is an equitable relief, and it's an interlocutory appeal. And I think the breadth of the court's discretion in this situation is pretty broad. And if there are things here that trouble you, I think that the remedy would probably be a remand for further consideration by the district court. But the injunction couldn't be in place in the meantime if there's questionable things, could it, sir, given that it's a speech of injunction? You know, I mean, if you find something in here that violates the First Amendment, I suppose you need to tell Judge Reeves to stop, just like he found things in here that violated Mississippi tort law, and he told them to stop. But I don't think it does. I think if the court is concerned that he did not give sufficient question, I mean, First Amendment law is not absolutely clear. You can regulate commercial speech. It is commercial speech. And if you say, but I don't see how this is false and misleading, I think you could send it back to him and say, we need you to consider this further. I think that's probably within your authority. But I don't think you need to do it. We've gone over, and Judge Davis got it right. Everything this guy says is intended to damage our business and help his. I don't think Judge Reeves abused his discretion in figuring that out and telling him to stop. Let me ask you one thing before you sit down. Now, the disclaimer was something that the court needed to put in, huh? And, you know, and that's not, he came up with that. What we asked him to do would have had big First Amendment problems. We said, take it all down and interpose a gag order under Marceau, and I acknowledged all kinds of First Amendment concerns about that. And he said, no, in my discretion, I'm not going to do that, with the exception of a handful of things that he said to take down, and he explained why they were false and misleading. He said, you can keep saying it, but when you say it, you need to put this disclaimer up front, where I'm going to tell you what I think this lawsuit is about, and then I'm not going to issue a gag order like Marceau. You say whatever you want about this lawsuit. I think that was, he did that on his own. I think that was a wise exercise of his discretion, or we'd have three or four more preliminary injunctions pending in this court, and I think what he did worked, and I think . . . But doesn't it violate Zeruto, because, Zeruto, because it's a controversial statement that they're requiring them to make? I don't think it's a controversial statement. It's a description of the lawsuit is decided by the district judge who's presiding over the lawsuit. So, it's factual, it's truthful, and I think it has been very helpful in allowing him to continue to use the Internet as long as he says this is what the lawsuit's about. I forgot to ask you about what are the contracts that are . . . do you believe that there should be at least an intention to enter into a contract under both of the Mississippi torts? And if you don't, then give me a . . . give us a case that says that there's not a requirement that there be at least an intention to enter into a contract. If you believe that there is an . . . has to be an intention to enter a contract, then can you please tell us where in the record there's evidence that there was an intention to enter into a contract? It depends on how you define contract, because Judge Davis is right. Every Mississippi case deals with both torts, and we asked him to deal with both torts, and the only one he mentioned was breach of contract. But as far as business relations is concerned, what we do is invite students to enter into a contract with us. Become a member of Phi Theta Kappa, and we give you benefits. And they pay. They pay a one-time $60 fee, I think it is, and yes, that's all over the record, where Dr. Lyncher Tadner . . . Tincher Ladner explains that we send these invitations out, and people say, great, I've made the Honor Society, and they send back their money. That's an invitation to contract, and in the months since they started going on the Internet, we were down $80,000. That . . . where you typically see that in Mississippi cases is a retail case. People used to come to my store, and since they started bad-mouthing us, they don't anymore. So to the extent that customers not walking in the door is a contract, members not joining the organization is a contract. As far as breach of contract is concerned, I refer you to the Seven Seas case, which says it's not just somebody breached a contract with you, but they declined to renew a contract. And we've got evidence of that, too. These PTK partners, 15 percent of them have decided not to renew. Judge Jordan says a non-renewal is the same thing as a breach of contract under the first tort for tortious interference with contract. The Mississippi Supreme Court case in Levins, I think, supports that. The Mississippi Court of Appeals case that Judge Jordan is referring to is a non-renewal, and it's a breach of contract under the first tortious interference with contract. Just before you begin, we do have a service at this court that people are not required to use, and we do not force them to use in any way, but it's designed to help lawyers resolve their disputes in the circuit mediator office, and that is Garrett Kane is in charge of that office, and that is a resource that we, in light of this discussion that this might be looming towards resolution, certainly we want to point out the court's resource in that respect, and that might be a very good idea for you all to reach out, but that is not foreshadowing anything about the merits of the case or the appeal, either one, but we wanted to point out that that is a resource, and we would suggest that perhaps you might avail yourself of that resource if that is something that you have raised with us today that you all are pursuing. And you've got a trial set in this case, what, in about two or three weeks? Pre-trial conference is in one month. The trial is in a month after that, and— So even after the arguments, you can pursue this resource in our court, and it's a free resource available. Thank you, Your Honor. My friend on the other side contending that this is moot wasn't related to any settlement discussion. It was that Judge Reeves dismissed our client's counterclaims without any consideration on the merits because he found that an out-of-court statement was supposedly inconsistent with an in-court statement, and so he dismissed our client's claims as a sanction. And then— There's going to be another appeal of that. Yes, Your Honor. And then PTK contacted us and said, the disclaimer says that you're a counterplaintiff. You're not a counterplaintiff, and so we're going to seek relief because you have this disclaimer up, which is false. You must take everything down. And because Judge Reeves dismissed our client's claims without consideration on the merits and found our client in contempt, when I don't think our client was in contempt, our client is scared to death of this judge and has agreed to take the content down. But that doesn't moot this appeal. Our client is only taking the content down because of this preliminary injunction. If the preliminary injunction weren't— Threat of contempt sanctions. Is that it? And the threat of contempt sanctions or something in the related matter? Is that one of the reasons that the client's probably willing to take it down? That wasn't a negative question. Yes, Your Honor. The client is scared of this judge. The judge has issued lots of unfavorable rulings that I think are unfair and unsupported by the law. And so our client is going to not speak at all about PTK or the case because our client is worried and its speech has been chilled. So far from being moot, this appeal is necessary so that our client can regain its First Amendment rights. And I would also suggest to the Court, as Judge Davis pointed out, we're on the verge of trial. This panel is considering lots of cases. I think that Chief Judge Elrod and Judge Ramirez are hearing 12 cases this week. It takes a lot of work to decide all those, but we would be extremely grateful if this Court would prioritize ours because we're on the verge of trial. Was this an expedited appeal? It was not expedited, but it is a preliminary injunction and this Court's decision could impact jury instructions and that trial. And so we would really appreciate if the Court could decide this case quickly. My friend on the other side was asked about causation and he cited a case, Gasparini, indicating that correlation is sufficient to show causation. And I have two responses to that. First, Gasparini is an intermediate court of appeals case. The Supreme Court of Mississippi should be the deciding factor. And in Scruggs, which came after Gasparini, it's clear that the defendant has to be the but-for cause of any harm and that would prevent relying solely on correlation. And the second point I would specifically note, that one canceling student had given the reason for canceling the membership that his or her personal information was being disclosed, which was the same point made in some of the content that was posted by your client. So why isn't that sufficient to show some causation? Because it's true. PTK's PTK Connect service is one where businesses can buy student data and then they receive marketing. So the fact that the student canceled because he received marketing is probably because he received marketing. Nowhere in that call record did he mention Honor Society. There's no evidence showing he ever saw a he canceled because he learned from Honor Society that PTK was selling his data. And if he did, I would suggest that that is a public service. Could that be possibly because Honor Society didn't disclose that it was the source of all of these posts? No, Your Honor. I think if you look at the record, it's clear that Honor Society is the source of the posts. The Twitter pages, Honor Society's, a lot of the posts were on Honor Society's own website. There was nothing incognito about Honor Society's approach. What about the articles that were AI generated? AI generated the articles and then Honor Society, through computer generation, posted them on its website. If assuming arguendo that your client posted things for an economic advantage on its website that were out in the public world, and it was because it's an economic advantage, is that actionable under Proctor? It is not, Your Honor. I think what the Court is referring to is the third prong of Bulger. There's three prongs. One is whether there's an economic motivation. And when you look at that, the cases say, is the primary motivation economic? And Honor Society didn't post this material because it's trying to generate membership, which is why none of the material calls for a commercial transaction. Rather, Honor Society's posting material about PTK because PTK posts material about Honor Society and says that Honor Society's a bad actor, and Honor Society wants the world to know that PTK is the bad actor. It's not that it's trying to generate memberships and there's no call for a membership purchase in any of the materials. You mentioned seven times, join us. Wasn't that a call for membership? I don't know exactly what he's referring to. I'm assuming it's that when there's articles published on a website, that that website also might have a link to join, but that's not part of the article. The article doesn't propose any commercial transaction. And even if there is a link to join, I think that the court needs to review it in context, and in context it is not commercial. Thank you. Is it your position that the true motivation of this is that these people just hate each other and they want to bring each other down, and so that's not a commercial speech purpose? I think, unfortunately, Judge Elrod, that that's a correct characterization, and it's free speech and fair but unfortunate competition, and the court should reverse. Thank you. That's contrary to the judge's finding, isn't it? The judge would say it was economic. Is that right? The judge found that there was economic motivation because in the preliminary injunction that PTK sought, PTK sought to have a widespread injunction where Honor Society could say nothing about this lawsuit or PTK, and Honor Society noted when seeking a bond that if it is allowed to say nothing, it can't even engage in comparative advertising. The court seized on that and said that these articles were economically motivated, but these articles were not comparative advertising, but if that widespread injunction issued, Honor Society would be prohibited from comparative advertising, and so the bond would be appropriate for that purpose, but not these articles, which should be analyzed individually in the context in which they  Thank you. We have your argument. We have the argument of your friend on the other side, and this case is submitted. Thank you.